UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON

CIVIL ACTION NO. 5:11-164

PAUL LITZ,     PLAINTIFF

v.     **MEMORANDUM OPINION AND ORDER**

UNIVERSITY OF KENTUCKY,
JAMES ALCORN, and PENNE ALLISON,     DEFENDANTS

\* \* \* \* \* \* \*

This matter is before the Court on the Motion for Summary Judgment filed by Defendants University of Kentucky, James Alcorn, and Penne Allison. (DE 25). This case arises from Plaintiff Paul Litz's termination from the University of Kentucky Medical Center, where he was employed as an Emergency Transportation Communications Technician. Litz alleges that he discovered his supervisor made threatening comments about him and that when Litz complained about these comments, he was wrongfully terminated. Defendants argue, *inter alia*, that Litz actually abandoned his job by refusing to come to work. For the reasons stated below, Defendants' Motion will be granted, in part.

**I. Background and Procedural History[1]**

Paul Litz was employed at the University from 2007 until June 10, 2010. Beginning in 2008, Litz worked as an Emergency Transportation Communications Technician for the

---

[1] As required on a motion for summary judgment, the Court views the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

1

University's Medical Center.  In this position, his duties included transporting adult and neonatal patients and working in dispatch.  Defendant James Alcorn was Litz's supervisor at all relevant times.  On May 13, 2010, Litz observed ambulance driver Bobby King reverse his ambulance into the mirror of another vehicle.  Litz did not see any damage but heard a small pop.  Two nurses were also present; neither said anything about the incident and boarded King's ambulance for their transport.  Litz spoke to Scott Terry, the lead communications technician, and told him to send Alcorn an e-mail about the incident.  Litz also sent an email detailing the incident to Alcorn.  After receiving the e-mail, Alcorn called Litz's unit to speak with Terry.  Following the conversation, Terry told Litz to schedule a meeting with Alcorn the next day.  According to Litz, Terry appeared quite nervous when relaying this information.

Although unable to discern anything said during the call, Litz believed the phone conversation involved a discussion of his e-mail about the incident.  Because the 911 units record all incoming calls, Litz accessed the call through the 911 computer and listened to the phone conversation between Alcorn and Terry.  He wrote a transcript from memory after work, but returned to the University later that evening to make a recording of the conversation.  Litz made an audio cassette recording and also took a digital recording on his iPhone.  The transcript reveals Alcorn said, "I am so damn mad I could smack his…smack the shit out of him" and "I am so damn mad right now that if I was there right now I would kick his hind end," during his conversation with Terry.  (DE 25-2, Litz Dep. at 87-88; DE 25-5, Transcript of Recording).

After hearing these statements, Litz corresponded with Alcorn via text message on the evening of May 13, 2010, to set up a time to meet the next day.  At 1:09 a.m. on May 14, 2010, however, Litz sent an e-mail to Defendant Penne Allison, Director of Emergency/Trauma Services, stating he had been threatened and needed her help.  Allison advised him to have no

2

further contact with Alcorn until she could investigate this complaint. Later that day, Litz met with Allison and Patti Howard. Howard manages the day-to-day operations in the University's emergency departments for Allison and supervises the communications staff, nurse care technicians, clerical staff, and pediatric emergency department staff. During the meeting, Litz reported Alcorn's comments, turned over the audio cassette recording of the conversation, and stated that he was uncomfortable at work because he feared for his safety. Around this time, Litz also contacted Michael Gay of the University's human resources department about this situation and to find out when Alcorn would be working next. (DE 25-2, Litz Dep. at 123-125). Litz did not work on May 15, 2010, but he did work on May 16 when Alcorn was not working. On May 17, 2010, Litz e-mailed Allison and Howard; Litz stated that he was uncomfortable working for Alcorn, and requested a transfer. This was the first time Litz mentioned a transfer. (DE 25-2, Litz Dep. at 124).

On May 19, 2010, Litz was informed he was suspended pending an investigation into whether University or department rules had been violated when he recorded the 911 dispatch line. (DE 25-10, Mem. from Howard and Allison). He was told he would be paid for the time off should the investigation show no policies were violated. The investigation was prompted by concerns that Litz had recorded confidential patient information. As part of this investigation, Litz met with Catherine Masoud, a University compliance analyst, to discuss his recording from the 911 computer. (DE 25-2, Litz Dep. at 110-113). When asked if there were other copies of the recording, Litz said the University now had the only tape he made of the call, but he did not tell Masoud about the digital copy he retained. (*Id.*) Litz also contacted Michelle Bailey of the University's human resources department to complain about his suspension. (DE 25-12, Employee Relations Case Documentation Form). He felt the real issue – being "threatened

3

terroristic-ally" by Alcorn in the recorded call – was not being addressed adequately. (*Id.*) In response, Bailey told Litz that his complaints about Alcorn were under investigation, but that if he wished to pursue concerns of terroristic threatening, he should contact the University police department. (DE 25-13, E-mail from Bailey to Litz, May 26, 2010).

On or about May 26, 2010, Allison concluded her investigation of Litz's complaints about Alcorn. After speaking with several communications department employees, including Alcorn, she concluded that he was not a violent person. Alcorn was suspended without pay for horseplay and unprofessional conduct, but this was unrelated to Litz. Overall, Allison concluded Alcorn represented no threat to Litz's safety. Allison explained, "Well in actuality, he wasn't threatened directly by Jamie. He overheard a phone call." (DE 25-8, Allison Dep. at 30-31). The investigation of Litz was also completed at this time. He was told he could return to work, and he was paid for the time he was suspended.

Nevertheless, on May 27, 2010, Litz informed Allison that he could not work with Alcorn. (DE 25-14, E-mail from Litz to Allison, May 14, 2010). He proposed a transfer to the security department where he once worked, and he said a supervisor there, Ron Williams, was receptive to that idea. The next day, Litz met with Allison and Howard. They issued a written warning to Litz for making the phone recording in violation of University policies, and they told him that if he did not return to work he could be terminated. Allison and Howard told Litz he could apply for any posted position at the University. Litz also suggested that he could be transferred to the Emergency Department, but Howard told Litz he could not be transferred there he because lacked the necessary training. Litz thought this was incorrect, but he did not go online and apply. (DE 25-2, Litz Dep. at 117). Litz did apply for a security position at Good Samaritan Hospital, which is within the University's system. (DE 25-2, Litz Dep. at 134-135).

4

Allison followed up with an e-mail telling Litz that he must work as scheduled on May 29, May 30, and June 3, or "be subject to corrective action … including termination of employment." (DE 25-16, E-mail Allison to Litz, May 28, 2010). Litz responded that he was uncomfortable working below Alcorn and that if he would not be allowed to transfer, he would not report to work. (DE 25-16, E-mail Litz to Allison, May 28, 2010). He did not appear for work on either May 29 or 30, 2010. On June 1, 2010, Allison again sent an e-mail to Litz telling him to report to work or risk termination. (DE 25-17, E-mail Allison to Litz, June 1, 2010). She also suggested that, if he wants to make an official claim of hostile work environment or harassment, he should contact the University's Office of Institutional Equity and Equal Employment Opportunity. (*Id.*) Litz sent an e-mail to that office. (DE 25-2, Litz Dep. at 125-128). He did not, however, pursue the formal grievance process available to University employees. (*Id.*) He said that even though he never stated he wished to file a grievance, he believed Allison or Howard should have assumed that was his desire and provided him the means to do so. (*Id.* at 142-143). The grievance process is explained in the Staff Handbook (DE 25-26) provided to Litz and is available online.

Litz continued to miss his scheduled shifts in June. Allison sent another e-mail stating that he faced termination for missing work. (DE 25-18, E-mail from Allison to Litz, June 3, 2010). Pursuant to University policy (DE 25-24), Litz's employment formally ended on June 10, 2010, due to his "job abandonment." On that day, Litz met with Howard to hand over his security badge. He also signed an "Employee Separation Sheet" and the reasons for separation selected are "Voluntary Quit," "Job Abandonment (Policy 70)." (DE 25-23). At this time, Litz asked Howard what he could do next, and she again directed him to the Equal Employment Opportunity Office. (DE 25-2, Litz Dep. at 168-169).

Litz initially filed this action in Fayette Circuit Court naming the University as the sole Defendant. Litz claimed he was employed by the University, Alcorn was his supervisor, and Allison was Alcorn's supervisor. In his Complaint, Litz asserted four state-law claims: retaliation, retaliation for asserting grievance, wrongful discharge, and intentional infliction of emotional distress. (DE 1-1). The judge in the state court action dismissed the University based on sovereign immunity, but allowed Litz to file an Amended Complaint naming Alcorn and Allison as Defendants and adding an additional allegation that they violated his Constitutional rights pursuant to 42 U.S.C. § 1983. (DE 1-1). The remaining Defendants then removed the action to this Court asserting that this Court has federal question jurisdiction under 28 U.S.C. § 1331. (DE 1).

Litz has since filed a "First Amended and Clarified Complaint" in this Court. (DE 20). The claims asserted are not entirely clear. Litz appears to continue to assert state law claims of wrongful discharge (Counts I and III) and intentional infliction of emotional distress (Count IV). Litz also continues to assert a retaliation claim but clarifies that he asserts that he was retaliated against in violation of the First Amendment to the United States Constitution (Count II). The Court assumes that this claim is asserted under § 1983. The Plaintiff also continues to assert a due process claim under § 1983 (Count V) against Defendant Allison. Although the state court previously dismissed the University, and the parties agreed it was not a proper party, Litz seemed to reassert all claims against the University in the "First Amended and Clarified Complaint."

## II. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Pennington v. State Farm Mut. Automobile Ins. Co.,* 553 F.3d 447, 450 (6th Cir. 2009).

6

The party bringing the summary judgment motion has the initial responsibility of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (196). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 324). Once the moving party has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Id.*

The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505 (1986). The Court must view all of the evidence in the light most favorable to the party opposing summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Analysis

#### A. Federal Claim Against the University of Kentucky

The Court must first note that in the "First Amended and Clarified Complaint" (DE 20) filed here, Litz once again asserted allegations against the University even though these same allegations were dismissed by the state court judge on the basis of sovereign immunity. Prior to filing this Amended Complaint, all parties had agreed that the University was no longer a party to this matter. (DE 12). Counts I through IV of the "First Amended and Clarified Complaint," however, appear to reassert the same state law claims against the University that the state court judge ruled were barred by sovereign immunity. Furthermore, having heard and decided the

7

issue, the state court's determination that Litz's claims against the University in Counts I through IV are barred by sovereign immunity is the law of the case. Under the law of the case doctrine, this Court will not reconsider an issue previously decided absent extraordinary circumstances. *Pacific Emp'rs Ins. Co. v. Sav-a-Lot of Winchester,* 291 F.3d 392, 398 (6th Cir. 2002). This Court, therefore, will not address the state law claims in Counts I through IV as asserted or reasserted against the University.

In Count V of the "First Amended and Clarified Complaint," Litz seeks to recover for violations of his Fourteenth Amendment rights under 42 U.S.C. § 1983 and 1988 from the University.[2] The Eleventh Amendment to the Constitution generally bars suits brought in federal court against a state and its agencies. *Grinter v. Knight,* 532 F.3d 567, 572 (6th Cir. 2008); *see also Weathers v. Ky. State Univ.*, No. 3:09-04-DCR, 2009 WL 1683711, *2 (E.D. Ky. June 16, 2009) ("state entities possess Eleventh Amendment immunity and, absent a waiver of this immunity, cannot be sued under § 1983"). Accordingly, the University is immune from this claim, and it is entitled to summary judgment.

### B. Federal Law Claims Against James Alcorn and Penne Allison

As an initial matter, the "First Amended and Clarified Complaint"[3] does not state whether Alcorn and Allison are sued in their individual or official capacities, or both. Defendants have argued that Litz's failure to sue them in their individual capacities means his claims against them

---

[2] In Count V, Litz also alleges that the University (and Allison) acted in violation of Section 2 of the Kentucky Constitution. To the extent that Litz attempts to bring a separate state cause of action "pursuant to Article II of the Kentucky Constitution," the Court will not address it. *See also Faul v. Bd. of Educ. of Danville Indep. Sch.*, No. 5:12-CV-277-KSF, 2013 WL 1511746, at *2 (E.D. Ky. Apr. 9, 2013) (explaining that the Kentucky Supreme Court has held that Kentucky law does not recognize a cause of action for alleged violations of Kentucky constitutional rights and that Kentucky's General Assembly has refused to create a constitutional tort akin to a federal *Bivens* action for violations of Kentucky's Constitution).

[3] The Plaintiff has filed two Amended Complaints – one in state court, and one in this Court – and neither has specified in what capacity the Defendants are being sued.

are the same as if asserted against the University, and thus must fail. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). Litz has not responded to this argument in any way.

Where a complaint is unclear regarding whether a state official is being sued in her individual or official capacity, the Sixth Circuit "employ[s] a 'course of proceedings' test to ascertain whether a § 1983 defendant was on notice that the plaintiff intended to hold him or her personally liable, notwithstanding the plaintiff's failure to provide explicit notice." *Rodgers v. Banks,* 344 F.3d 587, 594 (6th Cir. 2003). Applying this test, courts "consider the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims for qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability," as well as whether subsequent pleadings put a defendant on notice of the capacity in which he or she was being sued. *Id.* (quoting *Shepherd v. Wellman,* 313 F.3d 963, 968 (6th Cir. 2002)).

In this case, Litz's intention is not readily clear. Like the complaints before it, the "First Amended and Clarified Complaint" caption lists only the Defendants' names, not their official titles.[4] The initial and amended complaints refer to actions Alcorn and Allison took individually, but at other points, the complaints refer to "activities by the Defendant" and "conduct of the Defendant." The complaints never actually give Alcorn's or Allison's official title, but they refer to actions by his "supervisors" and "supervisor" and seek monetary damages. While Litz filed an Amended Complaint in state court to add Alcorn and Allison and then the "First

---

[4] Despite multiple amendments, the complaints filed by Litz have changed little since the initial complaint against only the University.

9

Amended and Clarified Complaint" in this Court, he never clarified in what capacity he was suing Alcorn or Allison. When responding to the Amended Complaint and when moving for summary judgment, however, Alcorn and Allison raised claims that they were entitled to qualified immunity, which indicates they had notice they were being sued in an individual capacity. *Rodgers*, 344 F.3d at 594. Considering the course of proceedings and the pleadings as a whole, the Court construes Litz's "First Amended and Clarified Complaint" as setting forth a cause of action against Alcorn and Allison in their official and individual capacities.

The claims against Alcorn and Allison in their official capacities, however, must fail. In their official capacities, Alcorn and Alcorn share the same immunity afforded to the University, so they too are entitled to summary judgment on the federal law claims asserted against them in their official capacity. The Court will now consider Litz's federal law claims against Alcorn and Allison in their individual capacities.

### 1. Retaliation (Count II)

To make a prima facie case of First Amendment retaliation, Litz must establish:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.,* 470 F.3d 250, 255 (6th Cir. 2006)). Litz, a public employee, must show he spoke as a citizen on a matter of public concern. "If an employee does not speak as a citizen, or does not address a matter of public concern, 'a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488,

2493 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Litz cannot make this showing, because he has not shown he spoke as a citizen or spoke on a matter of public concern.

Determining whether the speech at issue is a matter of public concern is a question of law for the Court. *Connick*, 461 U.S. at 165 n. 7; *Hughes v. Region VII Area Agency on Aging,* 542 F.3d 169, 180 (6th Cir. 2008). To make this determination, courts look to "the content, form and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147-148. As defined by the Supreme Court, "public concern" is speech "relating to any matter of political, social, or other concern to the community." *Id.* at 146. This "concern ordinarily does not extend to a public employee's speaking as an employee on matters only of his personal interest." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 965 (6th Cir. 2002) (citing *Connick*, 461 U.S. at 147.

In this case, Litz claims he was fired in retaliation either (1) for his complaint to Allison and Howard that Alcorn made threatening statements about him or (2) for his request to file a grievance against Alcorn. Neither touches upon a matter of "public concern," but instead focuses on personal interest. Litz's communications with Allison and Howard were motivated by self-interest and thus "more akin to an internal dispute over a job than a plea of a concerned citizen to [his] government to follow proper procedures." *Gragg*, 289 F.3d at 967. "If it were otherwise, an employee could characterize any internal dispute or grievance as relating to a matter of public concern simply by alleging that his employer did not follow proper and efficient procedures." *Id.* (citing *Rahn v. Drake Center, Inc.,* 31 F.3d 407, 412 (6th Cir. 1994)). Litz argues that his statements were about the public concern of workplace violence, but the form and context of his statements suggest otherwise. *See Guarnieri*, 131 S.Ct. at 2501 ("A petition filed with an employer using an internal grievance procedure in many cases will not seek to

11

communicate to the public or to advance a political or social point of view beyond the employment context."). Because Litz did not speak on a matter of public concern, his retaliation claim fails.

Moreover, Litz was not speaking as a citizen. According to the Supreme Court's decision in *Garcetti v. Ceballos*, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. 410, 421 (2006). The Sixth Circuit has held that relevant factors for determining whether an employee's statements were made pursuant to his duties include whether the statement was made "up the chain of command" and whether the content of the statement is "nothing more than the quintessential employee beef: management has acted incompetently." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540 (6th Cir. 2012) (internal quotation marks and citations omitted). Other relevant, but non-dispostive, factors include whether the statement was made at the workplace and whether it concerned the subject matter of the speaker's employment. *Id*. Litz's statements were made "up the chain of command" and contained the "quintessential employee beef." Thus, he was not speaking as citizen but pursuant to his duties.

Because the Court has determined there is no protected speech or conduct, Litz cannot make a claim for retaliation,[5] and so Alcorn and Allison are entitled to summary judgment on this claim.

### 2. Due Process (Count V)

In Count V, Litz alleges that the "Defendants, University of Kentucky and Penne Allison, denied the Plaintiff his property interest without due process of law in violation of the Fourteenth

---

[5] The Court need not address the remaining requirements for a prima facie claim of First Amendment retaliation, but it is skeptical Litz could satisfy either of those.

12

Amendment to the United States Constitution" by denying him a pre- or post-termination proceeding. The Fourteenth Amendment's Due Process Clause "provides that certain substantive rights – life, liberty, and property – cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541 (1985). When analyzing claims for the violation of due process, courts employ a two-step analysis, first determining whether the plaintiff has a property interest entitled to protection, and second determining what procedures were required to protect that interest. *Mitchell v. Fankhauser*, 375 F.3d 477, 479-80 (6th Cir. 2004). The second step – determining "what process is due" – is relevant only if Litz can first establish a constitutionally protected interest in his continued employment with the University. *Wilkinson v. Austin,* 545 U.S. 209, 224 (2005); *Bailey v. Floyd Cnty. Bd. of Educ.,* 106 F.3d 135, 141 (6th Cir.1997) ("Absent a property interest in her position ... [Plaintiff] was not entitled to any pre-deprivation process whatsoever."). Because Litz cannot show he had a constitutionally protected interest, his claim fails as a matter of law.

Protected property interests are "created and defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972). In Kentucky, absent a clear and specific agreement to the contrary, employment for an indefinite period of time is terminable at will by either party. *Shah v. Am. Synthetic Rubber Corp.,* 655 S.W.2d 489, 491 (Ky. 1983); *Prod. Oil Co. v. Johnson,* 313 S.W.2d 411, 413 (Ky. 1958). Thus, Litz must "point to some statutory or contractual right conferred by the state which supports a legitimate claim to continued employment." *Bailey*, 106 F.3d at 141. He cannot, so there is no dispute that Litz is an at-will employee. No statute or contract applies to his position as an Emergency Transportation Communications Technician for the University's Medical

13

Center. In fact, the staff handbook provided to Litz states that "[a]ll staff employment is at will." (DE 25-26, Staff Handbook at 3). "Staff" is defined as every employee except faculty, postdoctoral scholars, residents, clinical fellows, and teaching or research assistants. (*Id.*). Litz does not fall into any of these exceptions to at-will employment at the University. "An at-will employee is subject to dismissal at any time and without cause; consequently, an at-will employee cannot effectively claim a protectable property interest in his or her job." *Bailey,* 106 F.3d at 141. Accordingly, Litz cannot demonstrate a viable due process claim for deprivation of property, and so this claim fails as a matter of law.

One final matter deserves brief comment. Because Litz has failed to establish that his termination violated his First Amendment right to free speech or his Fourteenth Amendment due process rights, the Court need not go into detail when addressing the briefly raised qualified immunity arguments of Defendants Alcorn and Allison related to these claims. To evaluate the merits of a qualified immunity defense, courts engage in a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and if so, (2) whether that right was clearly established." *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). "When the defense of qualified immunity is raised, it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity." *Ciminillo*, 434 F.3d at 466. Simply put, Litz having failed to establish a constitutional violation, Alcorn and Allison are entitled to qualified immunity on these claims.

### C. State Law Claims Against Alcorn and Allison

Litz's remaining claims were brought under Kentucky law. Once a federal district court has dismissed all of the federal claims which provide the basis for its subject matter jurisdiction,

it must whether to exercise its discretion under 28 U.S.C. § 1367(c) to retain its supplemental jurisdiction over the remaining state law claims or remand the case to state court. "In determining whether to exercise supplemental jurisdiction, federal courts balance the values of judicial economy, convenience to the parties, fairness and comity to state courts." *Packard v. Farmers Ins. Co. of Columbus Inc.,* 423 F.App'x 580, 584 (6th Cir. 2011). *See also Gamel v. City of Cincinnati,* 625 F.3d 949, 951–52 (6th Cir. 2010). A court should retain jurisdiction over residual state law claims "only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Experimental Holdings, Inc. v. Farris,* 503 F.3d 514, 521 (6th Cir. 2007) (quoting *Moon v. Harrison Piping Supply,* 465 F.3d 719, 728 (6th Cir. 2008); *accord United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("if federal claims are dismissed before trial, ... the state claims should be dismissed as well"). Generally, "the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.,* 89 F.3d 1244, 1254–55 (6th Cir.1996).

Because all parties are Kentucky residents, the claims arise under Kentucky law, and the Court can discern no important federal interest in deciding the issues presented, the Court concludes that the exercise of supplemental jurisdiction is unwarranted over state law claims best decided by Kentucky courts. The Court will therefore remand the remaining state law claims to Fayette Circuit Court.

### IV.  Conclusion

For the above stated reasons, IT IS HEREBY ORDERED as follows:

(1) Defendants' Motion for Summary Judgment (DE 25) is GRANTED to the extent that the claims asserted pursuant to 42 U.S.C. § 1983 by Plaintiff Paul Litz (Counts II, V) are DISMISSED WITH PREJUDICE;

(2) Plaintiff's remaining state law claims are REMANDED to FAYETTE CIRCUIT COURT;

(3)  Judgment will be entered contemporaneously with this Order; and

(4) This matter is STRICKEN from the active docket.

This 22nd day of May, 2013.

Signed By:
*Karen K. Caldwell* KKC
United States District Judge